Stephen M. Roberts *v.* The State.

5   141
29  229
29  307

1. Jury — Special Venire. — The law of 1876 makes no provision as to the course to be pursued in supplying juries in capital cases after the special *venire* has been exhausted, as provided for in section 23., Nor does that law repeal all of the previous laws upon the subject of selecting and empanelling juries, but such only as conflict with its provisions. Verbal order of the court to the sheriff to summon talesmen, out of whom to complete the jury, after a special *venire* and the jury-box were exhausted, is not error.

2. Same. — It is too late after verdict to complain that accused has not been served with a copy of an indictment, and special *venire.*

3. Evidence — Murder. — Evidence to prove the violent character of the deceased, in the absence of proof that the accused was in danger of bodily harm at the time of the killing, was properly excluded.

4. Practice. — This court will not reverse the action of the court below in admitting or excluding evidence, unless it appears that objection was made when it was offered, and bill of exceptions reserved.

5. Dying Declarations, made under the restrictions of the statute, and stating the circumstances under which the declarant received the mortal injury, may be given as evidence in a prosecution for killing him. Nothing can be evidence in a declaration *in articulo mortis* that would not be evidence if the party were sworn. What the person *in articulo mortis* said as to facts is admissible, but not what he said of opinion. "S. R. killed me for nothing" states a *fact*, beyond opinion, and is admissible.

6. Same. — The substance of the declaration may be given in evidence, if the witness cannot give the precise language.

7. Murder — Charge of the Court. — It would have been error on the part of the court if it had instructed the jury on manslaughter, when the evidence showed the offence to be murder, in either the first or second degree.

8. Same — Degree and Malice. — The court instructed the jury on murder in the first and second degrees, and on malice, express and implied, giving clearly the statutory definitions. *Held,* sufficient, in view of the evidence.

9. Charge of the Court. — The official signature of the judge to the charge of the court is a full compliance with the article of the Code of Procedure which requires that the charge of the court be certified by the judge.

Appeal from the District Court of Panola. Tried below before the Hon. A. J. Booty.

The indictment charges the appellant with the murder of Henry M. Johnson, in Panola County, on November 18,

1872. The conviction was for murder in the first degree, for which the jury, exercising the power conferred by the Constitution of 1869, assessed the punishment at imprisonment for life, with hard labor.

The witness Guise, testifying for the State, swore that, some twenty or thirty days before the killing, he had a conversation with the appellant, during the course of which the appellant stated to witness that he had had trouble with his wife's people (appellant being a son-in-law of deceased), and that if he, appellant, was interfered with, he intended to kill some of them.

Mrs. Hamons, a daughter of the deceased, testifying for the State, swears that appellant came to her father's house on November 18, 1872, riding one and leading another horse, which he tied together and left tethered to the fence gate. He sat by the fire in the family sitting-room, talking friendly with deceased for some time, and finally asked the loan of deceased's wagon-harness. Deceased replied that he would need it next morning himself, to go to Marshall for family supplies, but that if appellant would await his return he could have the loan of the harness. Appellant and deceased remained some time longer, conversing by the fire in a friendly manner, the appellant finally inviting the deceased to walk out to the fence to inspect appellant's new, fine horse. The witness retired to the kitchen, to write on the dining-table, and soon heard the voices of appellant and deceased, which proceeded from the direction of the saddle or harness-house, which stood some eighteen or twenty yards off west, and fronting the kitchen door. She looked, and saw the appellant and the deceased confronting each other, appellant with a pistol presented at the deceased. She ran into the front part of the house and notified her sister, Mrs. Ellen Rector, that appellant was pointing a pistol at their father. The witness and Mrs. Rector ran, screaming, towards the harness-

house, observing as they ran that the appellant still had the pistol presented at the deceased. She heard the deceased say, " Don't shoot me, Steve," and then saw appellant shoot, when she turned and ran back towards the house. In a few seconds she heard the second shot, after which appellant ran out of the gate, mounted one of his horses, and rode rapidly away. Witness is a sister-in-law of appellant.

The testimony of Mrs. Ellen Rector is exactly the same as that of her sister, Mrs. Hamons ; going further, in that she swears that the first effort to fire, *after* the first shot, was a failure, when the defendant lowered his pistol to about the middle of his body and worked with it, as though capping it, after which he raised it and fired the second shot, at which the deceased put his hand on his stomach and started towards the house, falling when half way. Appellant ran out of the gate, and, on reaching his horse, looked back and cried out, " D—n you, I have killed you," and then mounted and rode away. Both witnesses swear that deceased had no weapon of any kind on his person.

Yarborough, witness for the State, swears that he was sent for to sit with and wait on the deceased the evening he was shot ; and that next morning the deceased, in possession of all his mental faculties, but conscious of approaching death, of his own free will, voluntarily, and without interrogation or solicitation on the part of witness, spoke of his conviction that he would not recover ; and stated, further, that the appellant had demanded of him the loan of his wagon-harness, which being refused by deceased, as he intended using it on a trip to Marshall, though offered as soon as he returned, the appellant answerd that " By G—d, he had come for the harness, and he intended to have them," to which the deceased said he responded, " I would like to see you get

them ; " whereupon, as the deceased informed witness, the appellant commenced shooting. The deceased told the witness that " Steve Roberts killed him for nothing."

The attending physician swears that the death of deceased proceeded from gunshot wounds ; and the sheriff of Panola County swears that he has had a *capias* for the arrest of appellant since his indictment, shortly after the killing, but could not find him, until he arrested him in Florida, about January, 1878.

The State closed, and appellant offered no testimony.

*Field & Oliver*, for the appellant.

*W. B. Dunham*, for the State.

Ector, P. J. The defendant was tried and convicted for the murder of one Henry M. Johnson, and his punishment fixed by the jury at confinement in the penitentiary for life.

In responding to the errors assigned, upon which we feel called upon to comment, we will follow the order in which they have been presented by the counsel who have briefed and argued the case for the defendant. The first error assigned is, that the District Court erred " in overruling defendant's motion to quash the additional special *venire* in the case, as shown by defendant's bill of exceptions."

As it appears from the bill of exceptions, " a special *venire* having been ordered, was exhausted, and only six jurors selected for the trial of the cause. The court thereupon ordered the sheriff, verbally, to summon twenty additional persons to supply said *venire;* which, when returned, was excepted to, and defendant moved to quash the same because the names of the persons constituting said special *venire* of twenty men were not drawn from the list of names selected by the jury commissioners as jurors to serve

for this term of the court; which motion to quash was over-ruled by the court, and the said *venire* of twenty put upon the defendant, to which he excepted."

The act of August 1, 1876, in regard to juries, provides as follows: " Sec. 23. Whenever a special *venire* shall be ordered, the names of all the persons selected by the jury commissioners to do jury service for the term at which such *venire* is required shall be placed upon tickets of similar size and color of paper, and the tickets be placed in a box, which shall be well shaken up, and from this box the clerk, in the presence of the judge, in open court, shall draw the number of names required for said special *venire*, and the names of the persons so drawn shall be attached to the writ of the special *venire facias*, and the persons named shall be summoned by the sheriff, or other lawful officer, by virtue thereof; provided, that when the whole number of jurors selected by the jury commissioners for any term of the court be less than the number required upon said special *venire*, the judge shall order the sheriff to summon a suffi-cient number of good and intelligent citizens, having all the qualifications of jurors prescribed in this act, to supply the deficiency; provided, that, in supplying the deficiency, it shall not be lawful for the sheriff, or any other officer, to summon as a juror any person within the court-house or yard, if they can be had elsewhere." Gen. Laws 1876, p. 83, sec. 23.

As we understand the record, there is no objection to the manner of selecting the six jurymen chosen out of the original *venire*. The first special *venire* consisted of sixty men. It does not affirmatively appear that, after the origi-nal *venire* was exhausted, there remained any of the jurors selected by the jury commissioners for the term.

There is no provision made in the jury law of 1876 as to the course to be pursued in completing a jury in a capi-tal case, after the special *venire*, as provided for in section

23 of said act, has been exhausted. This court has held that the act known as the jury law of 1876 does not repeal all previous laws upon the subject of selecting and empanelling juries, but only such as conflict with its provisions ; and that section 22 of said act has reference to the formation of the regular juries of the term, and does not apply to the manner of selecting juries in capital cases. *Taylor* v. *The State*, 3 Texas Ct. App. 169 ; *Harrison* v. *The State*, 3 Texas Ct. App. 563 ; *Johnson* v. *The State*, 4 Texas Ct. App. 269. We believe that the district judge who presided at the trial did not err, after the special *venire* was exhausted, in verbally ordering the sheriff to summon twenty talesmen, out of which to complete the jury, as was done in this case. Pasc. Dig., art. 3030.

The second error assigned is, that the court erred in refusing to sustain the objections of the defendant to the evidence of G. W. Yarborough, as shown by bill of exceptions. The record does not show that any objection, or bill of exceptions, was taken by the defendant to the testimony of Yarborough when it was offered. On the contrary, it appears therefrom that his testimony was admitted without any objection to it on the part of the defendant.

The defendant asked the witness Yarborough if he " knew Henry M. Johnson, in the neighborhood in which he lived, for peace or violence, when aroused." This question was objected to by counsel representing the State, and the objection was sustained by the court. To this ruling defendant excepted, and tendered a bill of exceptions. The court, in signing this bill, makes the following explanation : " I approve the foregoing bill of exceptions, and state that the objections made by the State's counsel were that there was no evidence that deceased was aroused at the time of the shooting ; and, further, that the question asked embodied no intelligent idea. I did sustain the objection to this particular question, and informed defendant's counsel that he

might propound, in any form he wished, a question embodying an inquiry as to whether the deceased, from his general reputation, was a man of violent or dangerous character, or a man of peaceable and inoffensive character; and that defendant's counsel declined to propound any but this particular question."

There was manifestly no error in this ruling of the court. The statement of facts affords no evidence of any action on the part of the deceased that was necessary to be explained; no evidence of an assault or threat, or any action by Johnson showing an intention on his part to assault the defendant. The witnesses to the homicide testify that, at the time of the killing, Johnson was standing still, doing nothing, and the only words he was heard to utter were, " Steve, don't shoot me." The evidence leaves no doubt upon the question as to whether or not the killing was done in self-defence. Under such proof, no evidence was admissible as to the character of the deceased for violence. The particular question, as asked, was certainly objectionable. As a general rule, evidence as to the character of the deceased is not admissible, the character being no part of the *res gestæ*. The correct rule of evidence in such cases is laid down by Mr. Wharton. He states the facts or circumstances under which such evidence is admissible. Whart. Cr. Law, 641.

Our Supreme Court, in the case of *Horbach* v. *The State*, 43 Texas, 242, held that, in a prosecution for murder, the general character of the deceased may be proved, when it would serve to explain the actions of the deceased at the time of the killing; but the actions it must serve to explain must first be proved before permitting evidence of the character of the deceased, and if no such acts are proved, its rejection is not error.

And this court, in the case of *Stevens* v. *The State*, 1 Texas Ct. App. 591, after recognizing the rule of law as

laid down by Mr. Wharton, proceeds to say that, in trials for murder, the reputation of the deceased cannot be given in evidence, unless the circumstances of the case raise a doubt in regard to the question as to whether the prisoner acted in self-defence. It is no excuse for murder that the person murdered was a bad man; but it has been held that the reputation of the deceased may be given in evidence to show that defendant was justified in believing himself in danger of losing his life, or of sustaining serious bodily injury from the deceased.

The testimony of the witness Yarborough principally relates to the dying declarations of Johnson. Johnson was the father-in-law of the defendant. The witness Yarborough was a neighbor of the deceased. Yarborough testified that he stayed with Johnson the night after he was shot, and that " on the next morning, after the doctors who had been called in to see Johnson had left, he was sitting by the bed of Johnson, and that he, Henry M. Johnson, told witness that he had no hopes of getting well, and that he could not live much longer; and that he commenced talking to witness about being shot, and told witness, without his (witness's) asking him any question, and voluntarily, — and he was rational at the time he made the statement,— that S. M. Roberts asked him for his wagon-harness, and that he told Roberts he wanted to use them the next day, to go to Marshall after family supplies, but that if he would wait until he got back he might have them; that Roberts then told him that ' By G—d, he had come after the harness, and that he intended to have them;' that he (Henry M. Johnson) told Roberts he would like to see him get them; that Johnson said ' Steve Roberts had killed him for nothing.' " On cross-examination, the witness Yarborough testified " that he could not say he could tell what deceased said to him in his (deceased's) statements, in the exact language used by the deceased; that the statement was made six years ago,

but that he could give the substance of it.'' Johnson was shot on the 18th and died on the 20th of November, 1872.

As we have before stated, so far as the record speaks, no objection was made to the dying declarations of Johnson when they were offered in evidence. Without a bill of exceptions, the well-established rule is not to reverse, on appeal, the action of the court below as to its rulings in either admitting or excluding evidence. *Brown* v. *The State*, 2 Texas Ct. App. 121; *Black* v. *The State*, 3 Texas Ct. App. 585.

One of the grounds set out in defendant's motion for new trial was, '' Because the court allowed witness G. W. Yarborough to testify to the statements of the deceased; he, Yarborough, having stated that he could give only his best impression as to what the substance of deceased's statements were.'' By reference to Yarborough's testimony, which we have given from the statement of facts, it will be seen that Yarborough testified he could give the substance of what deceased's statements were. The substance of the dying declarations may be given in evidence, if the witness is not able to state the precise language used. 1 Greenl. on Ev., sec. 161.

The restrictions under which such declarations are admissible are clearly defined by the Code of Criminal Procedure. '' The dying declarations of a deceased person may be offered in evidence, either for or against a defendant charged with homicide, under the restrictions hereafter provided. To render the declarations of the deceased competent evidence, it must be satisfactorily proved: 1. That at the time of the making such declarations he was conscious of approaching death, and believed there was no hope of recovering. 2. That the declaration was voluntarily made, and not through the persuasion of any person. 3. That such declaration was not made in answer to interrogatories calculated to lead the deceased to make any particular statement. 4.

That he was of sane mind at the time of making the declaration." Pasc. Dig., art. 3125. The testimony of the witness Yarborough satisfies us that the statements of Johnson were admissible as dying declarations, under the statute.

The only question which could arise would be as to whether or not that part of the statement which is as follows: "that Johnson said that Steve Roberts had killed him for nothing," comes within the meaning of dying declarations. The declarations of a person who expects to die, given under the restrictions required by the statute respecting the circumstances under which he received a mortal injury, are admissible in a prosecution for killing the person making the declarations. Nothing can be evidence in a declaration *in articulo mortis* that would not be so if the party were sworn. On this rule, says Mr. Wharton, " what the person *in articulo mortis* says as to the facts is receivable, but not what he says as a matter of opinion. Hence the declaration, ' It was E. W. who shot me, though I did not see him,' is inadmissible. But when, in making a dying declaration, the declarant, in speaking of the fatal wound, said it was done without any provocation on his part, it was held in Ohio that this declaration was not incompetent, it relating to fact, not opinion." Whart. on Hom., sec. 765 ; *Wroe* v. *The State*, 20 Ohio St. 460.

In the fourth and fifth errors assigned, the defendant insists that the court did not charge the law as applicable to the facts of the particular case on trial ; that the charge of the court on murder in the first degree was confused, and calculated to mislead the minds of the jury rather than to inform them on the subject, and that it was erroneous in defining murder in the second degree, and especially in the explanation of implied malice, as given in his second charge. The charge of the court defined murder in the language of the statute. It drew the proper distinction between murder in the first and murder in the second degree, gave the legal

definition of express and implied malice, and fully instructed the jury under what circumstances a person was justifiable in killing another in self-defence. The court also gave the defendant the benefit of a charge on the law of self-defence. We believe that the charge of the court is perfectly unexceptionable, and is worthy of commendation for the clearness and accuracy in which the jury are instructed as to the law which is applicable to the facts in evidence. There was not a particle of evidence upon which the jury could have found that the homicide was committed under the immediate influence of sudden passion, arising from an adequate cause. The case, as made by the evidence, was either murder of the first or murder in the second degree. It would, therefore, have been improper for the court to have submitted to the jury an instruction upon manslaughter. No such instruction was asked in this case. *Halbert* v. *The State*, 3 Texas Ct. App. 661; *Daniels* v. *The State*, 24 Texas, 389. In drawing the distinction between express and implied malice, the court below has closely followed the leading cases in our courts. See *McCoy* v. *The State*, 25 Texas, 33; *Farrer* v. *The State*, 42 Texas, 271; *Halbert* v. *The State*, 3 Texas Ct. App. 659.

The court, at the request of the jury, gave them an additional instruction upon the subject of implied malice. The Code of Procedure provides that "the jury, after having retired, may ask further instructions of the judge on any matter of law, which shall be given them in writing; but no charge shall be given except upon the particular point on which it is asked." Pasc. Dig., art. 3079. The additional charge in writing in this case, which was given by the court at the request of the jury, defines implied malice in the exact language of Mr. Justice Moore in *Farrer* v. *The State*, 42 Texas, 271; and the reference to express malice was necessary and proper, in order that the jury might clearly understand the legal signification of the terms

"implied malice," as distinguished from "express malice." No distinct and complete idea of implied malice can be conceived, unless express malice is at the same time understood.

The first, second, and third grounds set forth in defendant's motion for a new trial are as follows:

"1. Because the defendant was not served with a copy of the indictment, as required by law, two days before the trial, and because defendant was never served with a copy of the indictment on which he was tried.

"2. Because the defendant was not served with a copy of the *venire* summoned especially to try the cause.

"3. Because the copy of the *venire* served on the defendant was not a copy of the *venire* as summoned and returned by the sheriff," etc.

These objections came too late after verdict, in a motion for new trial. *Houillion* v. *The State*, 3 Texas Ct. App. 537; *Johnson* v. *The State*, 4 Texas Ct. App. 268; *Harrison* v. *The State*, 3 Texas Ct. App. 558.

The charge of the court was signed by the judge officially, and filed, as appears from the record; and this is a sufficient compliance with the article of the Code of Procedure which requires that the charge given by the court shall be certified by the judge.

We have examined every question raised in the case at bar with that scrutiny and care which the importance of the case demands, and we have found no error which would authorize a reversal of the judgment. The statement of facts shows abundant proof of malice, and that the killing of Henry M. Johnson by the defendant was a wanton, cruel, and deliberate murder. The defendant had a fair and impartial trial, and was ably defended. It simply remains for us to discharge our duty, and affirm the judgment of the District Court.

The judgment is affirmed.

*Affirmed.*